UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-21698-CIV-MORENO/SIMONTON

TOPP, INC., a Florida corporation,

     Plaintiff/Counter-Defendant,

v.

UNIDEN AMERICA CORPORATION,
a Delaware corporation,

     Defendant/Counter-Plaintiff.

_____/

### DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF SCOTT BOUCHNER REGARDING TOPP'S LOSS OF ITS NET INVESTMENT IN MEXICO AND OTHER THEORIES AND MOTION IN LIMINE TO EXCLUDE TESTIMONY ON LOST PROFITS

Defendant Uniden America Corporation (Uniden) moves for an order striking the expert

report of Scott Bouchner[1] and excluding him as a witness on Uniden's shipments of B-Stock

customer product returns to Plaintiff Topp, Inc. (Topp) and the alleged loss of Topp's net

---

[1]Plaintiff submitted Bouchner's expert witness report on September 6, 2006. The day of his deposition (October 6) and nearly one month after the discovery cutoff of September 11, Bouchner produced a substantial volume of financial documents which he had received from Topp concerning Topp's operations in Mexico. These included, among other things, four years of Topp Mexico audited financial statements, breakeven analyses, pro formas and other critical financial documents. Uniden had requested these very same materials *seven months before*. Topp's response to Uniden's repeated requests for that financial material was consistent: Topp *did not have* the financial documents for its operations in Mexico because those documents were seized by the Mexican authorities when the Mexican factory was taken over by the Mexican labor unions for failure to pay the factory employees of Topp's Mexican sister corporation, Topp Mexico. *See* Topp's Answer to Uniden's Interrogatories at ¶ 14 (Ex. A.) Topp's unexplained, belated production on October 6 seems to belie this representation. This extraordinary, untimely production of core financial documents relating to Topp's sales and the profitability of Topp's operations in Mexico directly relate to Topp's request to recoup the purported loss of its entire investment in Mexico on the theory that Uniden *caused* Topp's investment in Mexico to fail based on Topp's alleged breach of a putative indefinite oral exclusivity for Uniden's "as is" cordless telephones. Bouchner testified that he did not review or analyze these materials as they were not timely available to him and that his opinions are not predicated on any such analysis. The failure to review the financial data relating to the Mexican operations does not cure Topp's failure to produce that information. Both failures mandate exclusion of Topp's expert's report on the loss of Topp's net investment in Mexico.

investment in Mexico because he (and Topp) cannot support the reliability of the methodologies used in arriving at his opinions required under the *Daubert* standards. In fact, when questioned on whether Topp's alleged loss of its entire investment in Mexico is specifically attributable to any issues relating to Uniden, the witness testified: **"That would be a lost profits analysis, which I've testified I have not done."** Bouchner Depo at 167.[2] [emphasis supplied]

Similarly, when questioned on his opinions relating to the number of Uniden's customer returned cordless telephone products which Topp purchased – the model for all of Bouchner's other theories – the witness has said: **"I'm not making any determinations as to what should have gone to Topp or what could have been used for other purposes."**[3] [emphasis supplied]

Despite this, Bouchner attributes the alleged loss of Topp's entire investment in Mexico *to Uniden* and utilizes the *totality* of customer returned Uniden product for a seven-year period for all valuation methods in the Bouchner Report.[4] Bouchner cannot describe the reliability of the models he used to arrive at his opinions or how his opinions are even relevant to the claims in this case. The unreliability of the methodology is illustrated by the witness's own disclaimer as to the dollar calculation he ties to the *totality* of the Uniden returned product: the calculation "was never intended to be anything other than to convey that there are significant dollars involved or attached to those 1.3 million units. It wasn't used to calculate damages. It wasn't used [*sic*] anything more than to be illustrative that there is a substantial amount of money that would be connected with those products."[5]

---

[2]The pertinent portions of Bouchner's Deposition Transcript are attached to this Motion as Composite Exhibit B.

[3]*See id.* at 52.

[4]The Bouchner Report is attached to this Motion as Exhibit C.

[5]*See* Bouchner Depo. Tr. at 80 (Ex. B).

Uniden objects to Topp's bringing in an "expert" witness to support the models or to the use of the models or other data to support the reliability of the opinions. Because Bouchner cannot demonstrate the reliability of the models used, his opinions and testimony are inadmissable under *Daubert* and Federal Rules of Evidence 702, 703 and 403.

Furthermore, Uniden objects and moves to strike any proffered testimony by Bouchner or anyone else on behalf of Topp[6] relating to lost profits generally or for any particular calculation of lost profits. Bouchner has disclaimed any credible opinion on that subject, and those calculations could only derive from the financial information of Topp Mexico which was produced after the September 6 deadline for Topp's expert report and after the September 11 discovery cutoff. To the extent any lost profits calculations are used to support other claims by Topp for damages against Uniden, they are untimely and beyond what Topp has plead in its Amended Complaint. Any such calculations are also inadmissible because the methodology utilized to calculate them has been rejected by Topp's own expert and is otherwise irremediably flawed.

## I. Memorandum

In this breach of contract action based upon the purported indefinite oral exclusivity for Uniden's new cordless telephone product in Latin America as well as for Uniden's "as is" cordless telephone products all over the world, Topp has stated that it intends to present expert testimony on four separate theories which Topp intends to proffer to the jury to establish damages against Uniden. Bouchner's "expert" theories, if they are even relevant, are speculative,

---

[6]Robert Rubin is the Chief Executive Officer of Topp. (Rubin Depo. Tr. at 4, Ex. D.) He has attested to Topp's answers to interrogatories and presumably intends to attest to the answer to Uniden's damage interrogatory which the Court ordered to be served by September 1. (A copy of that answer is attached to this Motion as Exhibit E.) To date, Topp has not provided the attestation to its answer although it has been promised repeatedly.

arbitrary and unreliable and should be stricken accordingly.

**A.  Bouchner's Theory on Topp's Alleged Loss of Its Entire Investment in Mexico.**

Topp seeks damages in the form of the alleged loss of its entire investment in Mexico, which dates back to 1995 and precedes any written contract between the parties concerning Uniden's "as is" product.  On September 12, 2003, Uniden entered into a written agreement with Topp under which Uniden would offer to Topp all of Uniden's customer-returned B-Stock Uniden branded consumer cordless telephones except products used for Uniden's customer repair, customer service or consumer direct sales.  (*See* B-Stock Agreement at ¶ 1(a).)[7]  After lengthy negotiation, the parties to the written B-Stock agreement settled on a two-year term, with the express provision that either party could terminate the agreement upon the other party's failure to perform for 30 days and the agreement would automatically terminate if the parties could not agree upon pricing for 90 days.  (*See id.* at ¶ 3(b).)  As the two-year term came upon it, Uniden elected not to renew the written B-Stock Agreement and, months earlier, advised Topp that the agreement would terminate when the two-year term expired in September 2005.

All Topp's refurbishing of Uniden's "as is" product occurred in Mexico through a sister company called Topp Mexico.  Topp's income was derived in large part from its sales of that refurbished product.  In January 2006, the Mexican labor unions seized Topp  Mexico's factory, and the refurbishing operations came to a screeching halt.[8]

At trial, however, Topp now states that it will try to prove that *Uniden* caused Topp to lose its entire investment in Mexico dating back to 1995 based upon an alleged indefinite oral exclusivity for Uniden's "as is" cordless telephone product returns.  In order to prove that loss,

---

[7]For ease of reference, the written B-Stock Agreement is attached to this Motion as Exhibit F.

[8]Rubin Depo. Tr. at 100 (Ex. D).

Topp intends to present the testimony of Scott Bouchner, who is neither a CPA nor an economist, nor a certified fraud examiner, who failed to review any financial source data of Topp's operations in Mexico to support the claimed investment in Mexico, and who could not explain any connection or logical nexus to the model he intends to use to support his theory that Uniden caused Topp's loss. He is admittedly not an expert on the modeling that provided the opinion on the loss of investment to which he intends to testify.[9] Indeed, he confirms that the only predicate for his opinion on Topp's claim for the alleged loss of its entire investment in Mexico is David Topp's conclusory assertion that Uniden caused it:

> A:    I understand that ultimately, the majority shareholder of Topp, Inc., David Topp, would make decisions based on all of the facts that were known or knowable at the time that he would have entered into those agreements. *And I can't possibly know what would have been in his head at the time. So I have to assume that but for these acts, if he tells me that he would never have gone forward with this if he knew of those types of problems, I'll accept that as an underlying assumption.* [emphasis supplied]

> Q:    He's asked you to make that assumption. ...

> A:    **It's the predicate to this analysis.**[10] [emphasis supplied]

On this predicate alone, Boucher opines in his Report that:

> With a cumulative investment by Topp related entities into Topp Mexico, S.A. de C.V. of approximately $14,238,700 and net losses over the seven-year period of approximately $1,783,000, Topp's net investment was equal to $16,021,000. ... **Topp would have avoided the loss of this investment amount if it did not enter into its agreement with Uniden.**[11] [emphasis supplied]

---

[9]Bouchner Depo. Tr. at 21-22 (Ex. B). Mr. Bouchner has never testified in a federal trial proceeding, a jury trial proceeding or anything other than a divorce case. *Id.* at 24 ("Q: So, the only trial testimony you've given was in connection with a divorce case. Is that right? A: That's correct.")

[10]*Id.* at 149-50.

[11]Bouchner Report at 12 (Ex. C).

-5-

Bouchner further testified that he did not do "much of any economic analysis" in order to determine whether the assumption that he has been asked to make by David Topp – that the investment would never have been made – is even viable.[12]  Indeed, Bouchner admitted the inherent and irremediable flaw in the model he intends to offer at trial:

> There may be certain things that happen as part of business that are normal.  *I can't possibly put myself in the shoes of the owners of Topp – or the owner of Topp and make that decision*.[13]  [emphasis supplied]

This is, of course, precisely what Topp intends to do at trial:  present an expert opinion that David Topp would not have invested in Topp Mexico in 1995 had he known what he alleges today and, on that basis alone, would not have lost $16,021,000 after the Mexican authorities seized the operations.

Nothing in Bouchner's opinion on Topp's investment in Mexico connects Topp's putative loss of its investment to Uniden.[14]  Again, Bouchner concedes this:

> Q:    But you're not able to tell me to what extent – other than the decision to start the relationship with Uniden – to what extent losses that are reflected here  [$16,021,000]  are specifically attributable to issues relating to Uniden.
>
> A:    *That would be a lost profits analysis, which I've testified I have not done*.[15]  [emphasis supplied]

Bouchner's analysis is the only analysis used by Topp to support its theory that Uniden caused the alleged loss of Topp's entire investment.  This type of proffered expert testimony will not

---

[12]Bouchner Depo. Tr. at 159 (Ex. B).

[13]*Id.* at 160.

[14]Bouchner readily recognizes the analytical infirmity that results from his reliance on David Topp's subjective beliefs as the sole predicate for his expert opinion that Uniden caused Topp to lose its entire investment in 2006.  Half of the net profit and losses were incurred before 2000, three years prior to the parties' execution of the written B-Stock Agreement.  *Id.* at 160.

[15]*Id.* at 167.

help the trier of fact because it offers nothing more than what lawyers for the parties can argue in closing arguments, *i.e.,* what David Topp was thinking when he allegedly invested millions of dollars in Mexico with no written agreement and during times when the business was severely undercapitalized.  Indeed, Bouchner's testimony that he did not verify the different components[16] of that investment renders his testimony even more confusing and unreliable.

If Topp has factual evidence that Uniden caused the alleged loss of Topp's entire investment in Mexico, it can certainly produce such *factual* testimony at trial.  The jurors, after hearing the facts and closing argument, can make a just determination on these straightforward facts, without the conclusory opinions of an "expert."  Bouchner's opinion on Topp's alleged lost investment in Mexico should be stricken.

**B.**     **Bouchner's Theories on the Totality of  Uniden's "As Is" Customer-Returned Product.**

**1.**     **Bouchner's calculation of $72 million in "lost opportunity to Topp."**

Bouchner's entire expert report depends upon the composition of product returned to Uniden which Topp claims it should have received.   Bouchner readily admits, however, that he did not analyze the composition of the product; he simply prepared an analysis premised on the assumption that the totality of the units returned to Uniden over a seven-year period should have been shipped to Topp.  "I'm not making any determinations as to what should have gone to Topp or what could have been used for other purposes."[17]

In fact, Bouchner recognizes that Topp was *not* entitled to significant categories of product unit returns under the plain terms of the written agreements between the parties.  The following dialogue illustrates this point:

---

[16]*Id.* at 158-59 ("I didn't think much of any economic analysis.").

[17]*Id.* at 52 (objections to form omitted).

Q:   So you agree that there are categories of returns that Uniden was not required to make available for sale to Topp.  Correct?

A:   At certain points in time, I believe that's correct.[18]

These categories included internal usage by Uniden, consumer direct sales, A-1 sales to Damark, Famous Brands and other direct purchases, and product that was returned as new.[19]  Indisputably, the assumption underlying all Bouchner's theories — that Topp was entitled to *all* returned units — is invalid.  For this reason, Bouchner's model of a total of 1.3 million units completely ignores the composition of the product returned to Uniden and, as such, presents an unreliable framework for his theories.

The first such theory, on page 5 of the Bouchner Report, is characterized as Topp's "lost opportunity."  Bouchner opines as follows: "The following table contains examples of such products where there have been significant number of returns that were not shipped to Topp, the value of which totaled millions of lost opportunity to Topp."  Bouchner calculates that total value at $72,018,402.  At deposition, however, Bouchner explained that the $72 million calculation is completely unrelated to Topp's damage claim against Uniden:

Q:   Let's break that down.   The 72 million is based on ***Uniden's*** original shipping price.  Correct?  [emphasis supplied]

A.   It's the average shipping price of every product that was actually shipped. ...

Q:   But you're using ***Uniden's new product price*** in order to come to that number, aren't you?  [emphasis supplied]

A:   Yes.

---

[18]*See id.* at 53.

[19]*See id.* at 54-55.  On new product returns, the evidence is undisputed that Topp was not entitled to purchase those units under the written B Stock agreement, and Uniden has filed a motion in limine addressing this legal issue to properly narrow the scope of trial to the legal issues in dispute.

Q:   Topp didn't pay new product price for B-stock product; did it?

A:   No. ... *I have not done an analysis to quantify. This $72 million isn't intended to represent Topp's lost opportunity;* it's just indicative that there was a lost opportunity that would have been in the millions of dollars. [emphasis supplied]

...

Q:   But the lost opportunity would be a function of what Topp's purchase price to Uniden would be for that product; not for Uniden's retail new product sales price.

A:   Right. *But the purpose here was to demonstrate that there is millions of dollars involved. And it was not – if I wanted to say that Topp's lost opportunity was $72 million, I would have indicated that in the text.* This was just a table to provide some context.[20] [emphasis supplied]

The purpose for Bouchner's testimony is to proffer expert opinion, not "context." What Bouchner claims to provide is confusing and misleading for three reasons. First, Bouchner's Report introduces the $72 million calculation as "the value of which totaled millions of dollars of lost opportunity to Topp." He does not explain in the text that the $72 million is *not* the specific calculation he intends the jury to focus upon as the lost opportunity to Topp. So, if not $72 million dollars, Bouchner's Report states no damage figure whatsoever for what Bouchner calls "Topp's lost opportunity." Indeed, there is only one plausible conclusion a juror could reach, and it is the exact opposite of what Bouchner testified as representing his opinion. Second, the $72 million value is based upon a total number of returns, which Bouchner admits does not represent the units Topp was entitled to receive. Third, the $72 million value is derived from *Uniden's* sales price for *new* product, not "as is" product which was sold to Topp at a different and substantially lower price.

---

[20]*Id.* at 82-85.

Bouchner's methodology lacked the application of relevant material for this opinion. For example, Bouchner (1) does not have "a thorough understanding of the costing of Topp's refurbishing operations;" (2) did not look at the fixed costs in operation versus the variable costs; (3) did not look at the cost records for the operations in Mexico; (4) did not do other research to determine whether Topp lost a single sale that it would have been able to make had it received the product Bouchner claims Uniden failed to ship to Topp; and (5) did no other research to determine what inventory Topp had separate and apart from the inventory which Uniden did not ship to Topp.[21]

Based on Bouchner's testimony, the Court should find that Bouchner's proposed testimony is merely conclusory and unreliable, and fails to specifically identify the methodology or reasoning he used to conclude that the value of $72 million at Uniden's sales price for new product for the total number of customer returns for seven years represents Topp's lost opportunity in this case. The Court should exclude Bouchner's opinion and testimony accordingly.

### 2. Bouchner's delayed shipment theory.

Bouchner opined in his report that Uniden delayed shipments of its higher priced B-stock products to Topp until the market prices dropped considerably, while the lower-priced products were shipped with little or no delay. Bouchner used 5,000 unit returns to Uniden and 5,000 unit shipments to Topp as the benchmark for his shipment delay theory. The theory is premised on an artificial circumstance, which Bouchner admitted in deposition he has no evidentiary support to sustain.

---

[21]*Id.* at 33, 38 & 62-63.

Bouchner's theory assumed that a container sat in Uniden's possession for anywhere from nine to fifteen months before being delivered.  Quite simply, that never happened.  This is because the parties did not transact business in this manner, and Bouchner readily admits that.  In other words, Bouchner's theory is purely arbitrary:

> Q:    [Y]ou based your analysis on these 12 examples – Exhibits, I
>         believe, A-1 through A-12 of your report – on a 5000-unit
>         threshold.  Correct?
>
> A:    Yes.
>
> Q:    Did you see anything in any of the contracts between the parties
>         that established that threshold?
>
> A:    No.
>
> Q:    Was that number given to you by Topp?
>
> A:    No.
>
> Q:    How did you determine to select that number?
>
> A:    I looked at 3,000, I looked at 10,000.  I tried to come up with a
>         number that seemed reasonable enough to cover a wide range of
>         products, because some products never got to 10,000.  So that
>         seemed like it would be too high. ...  There was no magic to 5,000.
>         It could have been 4,000 or 6,000. ...[22]

The demarcation of the 5,000 is meaningless because it does not reflect the business relationship between the parties.  In addition, Bouchner predicated his delayed shipment theory on all returns received by Uniden over the seven-year period without recognizing that nearly all of those returns were never eligible for purchase by Topp.  Finally, Bouchner completely fails to acknowledge the specific evidence illustrating the manner in which Topp requested shipment of

---

[22]*Id.* at 110-11.

*certain product models over others* and, in many instances, *no product at all*.[23]  Indeed, Bouchner acknowledged that he could not tell whether Topp was harmed, or Uniden helped, by the purported delay even though the Bouchner Report suggests otherwise.[24]

Assuming *arguendo* that the delayed shipment of product were relevant to any pleaded claims in this case, Bouchner's Report contains no evidence that Uniden caused any delay of shipment or that Topp suffered from any delay in shipment by Uniden.  Bouchner's proposed testimony is arbitrary and fails to specifically identify how the methodology or reasoning he used to reach his opinion derives from the facts and the legal issues in this case.  Bouchner's delayed shipment theory should be stricken.

### 3.   Bouchner's theory on a decline in customer returns to Uniden as a percentage of shipments to Topp.

In his Report, Bouchner has opined that Uniden's agreement with Wal-Mart in January 2005 relating to the purchase and sale of Uniden's new cordless telephones had the effect of reducing customer returns to Uniden.  From that premise, Bouchner has opined that the percentage reduction in those customer returns represents a percentage reduction of "as is" customer returns that should have been offered to Topp.  Bouchner's opinion is conclusory and unreliable for two reasons.

---

[23]By email dated May 17, 2000, Topp specifically outlined to Uniden the order of priority in which Topp requested future shipments of "as is" cordless telephones.  Similarly, Uniden requested Topp to advise as to the number of trailers Topp anticipated taking in a month, to which Topp responded that it did not wish to receive the total number of trailers offered.  Bouchner's contrived delayed shipment theory based on the arbitrary 5000th unit ignores these facts.

[24]*See* Boucher Depo Tr. at 61 (Ex. B) (conceding no documentary evidence that Uniden benefitted from Bouchner's delayed shipment theory and stating, "I can only speculate as to the positive benefits that could conceivably be received by Uniden ... "); *see id.* at 62-63 (admitting that he did not do any analysis on any lost sales by Topp resulting from Bouchner's delayed shipment theory).

First, Topp has not pleaded a claim on the decline in customer returns to Uniden (nor could it),[25] and Topp cannot present expert testimony on a claim that is not properly before the Court. Second, Bouchner's theory is speculative. Bouchner analyzed the credits issued to Wal-Mart after the agreement with Uniden was in force. The returns from Wal-Mart would not have been affected until approximately June 2005, *after* Topp had ceased purchasing product from Uniden.

Finally, Bouchner's theory that the decrease in customer returns to Uniden is suggestive of something against Topp, as opposed to the result of a fundamental business objective to minimize returns, is without any evidentiary basis whatsoever. It is precisely the type of testimony that, cloaked with the talismanic label of expertise, confuses the issues before the jury.

### C.   Topp Should Not Be Permitted to Present Any Testimony on a Lost Profits Claim Because the Opinion is Unreliable and is Untimely.

The closest thing to an "analysis" that Topp has offered on its lost profits claim comes from its CEO Robert Rubin, and is based on financial information that Topp failed to timely produce. Because Topp's proffered opinion is both untimely and unreliable, Topp should not be permitted to present testimony from Rubin or any other witness relating to lost profits.

First, Topp's opinion on its lost profits claim is untimely. Any proffered testimony – from Rubin, Bouchner, or anyone else – relating to lost profits must be based on Topp's own financial information. Topp produced voluminous financial documents to Bouchner, who then produced them to Uniden on the day of his deposition, October 6, 2006. Topp's production was inexplicably late.[26] Uniden received these critical financial documents after the September 6

---

[25]Uniden has moved for summary judgment on this unpleaded claim. *See* Motion for Summary Judgment at 32 (DE# 102).

[26]During the deposition of Harry Wilkins on October 6, Topp made the following representation (continued...)

deadline for Topp's expert report, after the September 11 discovery cut-off, and more than seven months after Uniden had requested this financial information. Given that Topp's production of these financial documents was untimely, Topp cannot now rely on these documents to support its damages claims. For this reason alone, any lost profits analysis should be stricken.

Second, even if Topp had produced its supporting documents in time, Topp's opinion on its lost profits claim is inherently unreliable. Indeed, Topp's expert was unwilling to perform a lost profits analysis.[27] In lieu of an expert analysis, Topp's CEO Rubin has performed certain calculations based on his own assumptions. Rubin is not qualified as an expert in this litigation, and he is not competent to render an expert opinion regarding lost profits or any other topic. In fact, Bouchner did not even review Rubin's calculations.[28] Thus, on the topic of lost profits, Topp is left with an "analysis" performed by a lay witness that its own expert witness has refused to even review.

Not surprisingly, Rubin's lost profit analysis is fatally flawed. He has testified that his calculations are based on gross margins, and that "whatever margin would have been produced by those phones would have fallen to the bottom line."[29] However, both Florida law and Texas law require that a lost profits analysis take into account and allocate at least some portion of fixed costs.[30] Indeed, Topp's former CEO, Odalys Kuck, has acknowledged that some portion of

---

[26](...continued)
at page 57 of the transcript: "Let me just say that every piece of paper in Topp's possession has been produced in this case."

[27]Bouchner Depo. Tr. at 86 (Ex. B).

[28]*Id.* at 50-51.

[29]Rubin Depo. Tr. at 258 & 287 (Ex. D).

[30]*See Boca Developers, Inc. v. Fine Decorators, Inc.*, 862 So. 2d 803, 805 (Fla. 4th DCA 2004) (overhead expenses must be allocated and deducted to determine lost net profits, on a claim by decorator
(continued...)

overhead should have been included in Topp's cost figures, but was incorrectly omitted.[31]  Kuck

has testified that she "would disagree" with that omission because it yields a greater "gross profit

margin" than would be appropriate to report.[32]  Even Topp's expert, Bouchner, has testified that

fixed costs must at least be considered in any lost profits analysis.[33]  Because Rubin's lost profits

methodology is undermined by Topp's own witnesses, his entire analysis and conclusions should

be stricken.

Rubin's flawed lost profits analysis covers Lectron, AVS, and Costco-Mexico, in

particular.  With respect to Lectron, Rubin calculated Topp's lost revenue at $800,000.[34]  Yet, in

running this calculation, Rubin failed to take into account whether Topp was able to sell any of

its inventory to customers other than Lectron: **"I didn't perform any analysis."**[35]  [emphasis

supplied]  Rubin has admitted that Topp easily could have sold higher-end inventory to other

customers;[36] this factor (had he considered it) would significantly lower Rubin's "lost revenue"

---

(...continued)

for breach of contract to furnish model apartments to be sold by developers); *Fu Sheng Indus. Co. Ltd. v. T/F Systems, Inc.*, 690 So. 2d 617, 623 (Fla. 4th DCA 1997) (lost profit damages must reflect net profits deducting all costs); *Indian River Colony Club, Inc. v. Schopke Constr. & Eng'g, Inc.*, 592 So. 2d 1185, 1187 (Fla. 5th DCA 1992) (lost profits analysis must deduct the actual supervisory salary paid as well as other operating expenses and costs); *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App. 2004) (evidence of lost profits calculated by multiplying an undefined percentage profit margin by sales insufficient to prove lost net profits; plaintiffs failed to meet their burden of proof to show the method by which the profit margin was calculated or that expenses had been deducted); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 209 (Tex. App. 2004) (judgment for plaintiff on evidence of gross profits reversed and judgment ordered entered for defendant).

[31]Kuck Depo. Tr. at 200 (Ex. G).

[32]*Id.* at 201.

[33]Bouchner Depo. Tr. at 35 (Ex. B).

[34]Rubin Depo. Tr. at 280 (Ex. D).

[35]*Id.* at 287-288.

[36]*Id.* at 288.

number.  Moreover, Rubin could not explain why he used a time period ending in May 2006, when the contract between Topp and Uniden expired in September 2005 at the latest: **"I can't tell you the reason for it."**[37]  [emphasis supplied]  Rubin also inexplicably included profits for both Topp, Inc. and Topp Mexico, even though Topp Mexico is not a party to this litigation and Rubin has admitted that Topp Mexico did not assign any rights to Topp, Inc.[38]

As to AVS, Rubin's analysis collapses because it has no factual foundation.  Rubin makes crucial assumptions about the nature of the AVS returns, but fails to analyze the specific AVS product mix: **"I don't have any facts."**[39]  [emphasis supplied]  Without any supporting facts, Rubin "just assumed that it was the same blend of product" as Topp expected to receive from Uniden.[40]  If, by contrast, Rubin had assumed that the AVS product mix was comparable to what Topp had received from Uniden, then his profits number would have been lower.[41]  Rubin has admitted that he has no way of knowing whether his particular assumption was correct[42] – throwing obvious doubt on his conclusions.  Moreover, as with Lectron, Rubin's analysis for AVS incorrectly relies on gross margins and includes profits for both Topp, Inc. and Topp Mexico.[43]

As to Costco-Mexico, Rubin's analysis suffers from a similarly glaring lack of support.  Any claim relating to Costco-Mexico belongs to Topp Mexico, not to Topp, Inc. – and, again,

---

[37]*Id.* at 280-281.

[38]*See id.* at 281-282.

[39]*Id.* at 290.

[40]*Id.* at 288-289.

[41]*See id.* at 289.

[42]*See id.* at 290.

[43]*See id.* at 284.

there has been no assignment of rights from Topp Mexico to Topp, Inc.[44]   Indeed, Rubin has admitted that any sale from Topp-Mexico to Costco Mexico would *not* be a sale from Topp, Inc. to Costco Mexico.[45]   Even so, there is no competent evidence to support any Costco Mexico transaction at all.  Rubin knows of no actual purchase orders from Costco Mexico: "So we had never received a formal purchase order."[46]  He makes much of the fact that Topp Mexico could not fulfill one purported Costco Mexico purchase order – which he does not recall seeing – because Uniden had not timely delivered the product.[47]   However, when Uniden explained that Costco U.S. had purchased all of that product, and offered to put Rubin in contact with Costco U.S. to confirm the explanation, Rubin refused: **"I am speculating."**[48] [emphasis supplied]  Speculation may be enough for Topp, but it is not enough for an analysis in this trial.

In the end, Rubin's lost profits "analysis" finds little support in the facts, and whatever supporting documents he (or any other witness) relies on were not timely produced.  Therefore, Topp should not be allowed to present any opinion relating to lost profits.

## II. Legal Argument

This Court is fully aware of its gatekeeping responsibilities in making decisions to admit or exclude expert testimony under the *Daubert* trilogy.  *See generally Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  In its *en banc* decision in *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004), the Eleventh Circuit noted that the purpose of

---

[44]*See id.* at 281.

[45]*See id.* at 187.

[46]*Id.* at 189; *see id.* at 182 & 186.

[47]*See id.* at 187-188.

[48]*See id.* at 193, 247-48.

this gatekeeping function is to ensure the reliability and relevancy of the expert's opinions. Thus, before admitting expert testimony, a District Court must find that proposed expert testimony is properly grounded, well reasoned, and not speculative. *Kumho*, 526 U.S. at 141, 147-150. Because expert testimony "may be assigned talismanic significance in the eyes of lay jurors ... courts should carefully apply the standards articulated in *Daubert* and its progeny for the introduction of such testimony, and must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier,* 387 F.3d at 1263.

The burden of proving that the expert is qualified, that the method he used is reliable, and that the testimony can assist the trier of fact is on the proponent, in this case Topp. *Id.* at 1260. Bouchner is not, by his own admission competent to prove the reliability (or the relevance) of the models.

Because Bouchner uses a model with a $72 million calculation which he readily admits does not reflect Topp's damage, and which is not tested against Topp's sales or even its ability to make any sales of the customer returned product in question, the Bouchner model is irrelevant and unreliable. To a jury, though, the Bouchner model may *sound* scientific. Expert testimony may be assigned "talismanic significance in the eyes of lay jurors." *Frazie*r at 1263. Thus, if the Court permits admission of the testimony based on Bouchner's model, the jury may well be misled into believing it reflects an amount of damages suffered by Topp and is more accurate than any other form of proof. Additionally, Bouchner testified that he did not have the financial data *from Topp* that would be necessary to perform a lost profits analysis for Topp's operations in Mexico. Without verifying Topp's investment in Mexico (allegedly $16,000,000), Bouchner nevertheless intends to present expert testimony validating that investment. Because the probative value of this type of testimony is far outweighed by the potential prejudice, the

testimony based on the unsupported models should also be excluded on Rule 403 grounds.

The reliability of the process or technique used by the expert to derive his opinions is the foundation for admissibility. *See In re TMI Litigation*, 193 F.3d 613, 664 (3d Cir. 1999). Validity for one purpose is not validity for another, especially where testing is unknown. *Id.* at 669-70. Bouchner's testimony that David Topp told him he would not have invested in the business as the *sole* predicate for Bouchner's theory on Topp's alleged loss of its entire investment does not cure his lack of qualifications to explain the methods used in this case. Bouchner demonstrated at his deposition that his opinions do not meet the criteria of

> **Fed. R. Evid 702**:  If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Court is required to examine the expert's methods and qualifications with an "exacting analysis," and when it does so in this case, the witness will be found unqualified to render the necessary opinions, and the opinions will be inadmissible. *See McCorvey v. Baxter Healthcare*, 298 F.3d 1253, 1256 (11th Cir. 2002)(exacting analysis requirement*)*.

Bouchner's theories, completely lacking in factual nexus and leading to absurd results, cannot withstand *Daubert*.  *See, e.g., R.J. Reynolds v. Premium Tobacco Stores*, 2004 WL 1613563 *8-9 (N.D. Ill. Jul. 19, 2004) (where "benchmark achievement levels" were not connected to any factual basis and not derived from any valid reasoning or methodology, the court excluded the report, holding that "if the applicable data and the proffered opinion are separated by an analytical chasm, it cannot be bridged solely by the expert's say-so, and the expert opinion will not support a jury verdict."); *General Elec. Co. v. Joiner,* 522 U.S. 136, 146

(1997)(although "[t]rained experts commonly extrapolate from existing data[,] . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

## III. Conclusion

For the foregoing reasons, the Bouchner opinions are not admissible.  Similarly, the answer to Uniden's damage interrogatory that purports to assert a lost profits claim outside the Bouchner Report is inadmissible because it is untimely and its methodology is flawed.

Dated: October 13, 2006
Miami, Florida

Respectfully submitted,

s/Amanda M. McGovern
Stanley H. Wakshlag (Florida Bar No. 266264)
shw@kennynachwalter.com
Amanda M. McGovern (Florida Bar No. 964263)
amm@kennynachwalter.com
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard, Ste. #1100
Miami, FL  33131
T: (305) 373-1000
F: (305) 372-1861
**Attorneys for Defendant Uniden Corporation**

## CERTIFICATE OF SERVICE

**I hereby certify** that on October 13, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Amanda M. McGovern
Amanda M. McGovern

SERVICE LIST
**Topp, Inc. v. Uniden America Corporation**
**Case No. 05-21698-Civ-Moreno/Simonton**
**U.S. District Court, Southern District of Florida**

Andrés Rivero, Esq.
arivero@rpm-law.com
Jorge Mestre, Esq.
jmestre@rpm-law.com
RIVERO PALMER & MESTRE, LLP
2525 Ponce de Leon Blvd.
Suite 1000
Coral Gables, FL  33134
Phone: 305/445-2500
Fax: 305/445-2505
Attorneys for Plaintiff
[Topp, Inc.]
[via CM/ECF electronic filing]

Stanley H. Wakshlag, Esq.
shw@kennynachwalter.com
Amanda M. McGovern, Esq.
amm@kennynachwalter.com
KENNY NACHWALTER, P.A.
201 South Biscayne Blvd.
Suite 1100
Miami, FL 33131-4327
Phone: 305/373-1000
Fax: 305/372-1861
Attorneys for Defendant
[Uniden America Corporation]